ADAM R. FULTON, ESQ.
Nevada Bar No. 11572
E-mail: afulton@jfnvlaw.com
CHRISTINA M. GILBERTSON, ESQ.
Nevada Bar No. 9707
Email: christina@jfnvlaw.com
LOGAN G. WILLSON, ESQ.
Nevada Bar No. 14967
E-mail: logan@jfnvlaw.com
**JENNINGS & FULTON, LTD.**
2580 Sorrel Street
Las Vegas, Nevada 89146
Telephone: (702) 979-3565
Facsimile:   (702) 362-2060

JOEY S. GILBERT, ESQ.
Nevada Bar No. 9033
joey@joeygilbertlaw.com
ROGER O'DONNELL, ESQ.
Nevada Bar No. 14593
roger@joeygilbertlaw.com
**JOEY GILBERT & ASSOCIATES**
405 Marsh Ave.
Reno, Nevada 89509
Telephone: (775) 284-7700
Facsimile: (770) 284-3809
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| TONIA ATKINS; MARIELA BARRETO; BONNIE BRUCKNER; PAULA DEHNER; ERNEST DOMANICO JR; LISA FILUTZE; ATHENA GARRISON; JOY GUIDO; JENNIFER HARRIS; TAMMY KRALICK; CLAIRE McGARTLAND; CAROLE MOREO; LYNDA MURPHY; CARRIE PARR; JENNIFER PHILLIPS; CATHY RHODES; SUZANNE VAROS; and JACQUELINE YOUNG, | Case No. |
| | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | |

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

CLARK COUNTY SCHOOL          )
DISTRICT, DR. JESUS F. JARA, in   )
his official capacity as           )
SUPERINTENDENT OF CLARK      )
COUNTY SCHOOL DISTRICT; and   )
JOHN AND JANE DOES I-V.        )
                                )
          Defendants.           )
                                )
_____

Plaintiffs, by and through their undersigned counsel, hereby as and for their

Complaint, allege as follows:

## I.     INTRODUCTION

1.      Plaintiffs are employees of Clark County School District ("CCSD"),

which recently mandated all employees receive the COVID-19 "vaccine,"[1] or

undergo frequent COVID-19 testing outside of work hours and without

compensation and wear a mask (the "Testing Mandate").

2.      On or about September 2, 2021, the CCSD Board of School Trustees

voted to authorize Superintendent Dr. Jesus F. Jara to:

> [D]evelop and implement a mandatory vaccination plan through which School District employees will be required to by fully vaccinated against COVID-19. The plan will include a process for requesting accommodations from the vaccination requirement for either medical conditions or for sincerely held religious beliefs…
>
> Superintendent Jara will develop the plan as rapidly and carefully as possible through consultation with District staff, union representatives, and partners.

*See,* **Exhibit A**.

---

[1] For clarity of reference, Plaintiffs are using the names given to the medical products by their manufacturers and Defendants. However, Plaintiffs reject the highly misleading use of the term "vaccine" to describe these medical products, since they are not vaccines within the settled meaning of the term and, instead, are more precisely described as a form of experimental genetic manipulation.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

3.      The forthcoming vaccination plan will be referred to herein as the "Vaccine Mandate."   The Testing Mandate and the Vaccine Mandate may collectively be referred to herein as the "Mandates."

4.      Some Plaintiffs[2] have already recovered swiftly from COVID-19 (the "COVID-Recovered Plaintiffs") and continue to have robust natural immunity that is superior to the vaccine-induced immunological response now mandated by Defendants.

5.      The COVID-Recovered Plaintiffs, and others similarly situated, can work with their healthcare providers to prove their natural immunity through accepted clinical definition and laboratory testing where indicated ("Prescreening"), including, but not limited to, patient history, or a T-cell test.

6.      All Plaintiffs have moral, ethical, and/or religious beliefs that are opposed to the Mandates.

7.      Several Plaintiffs submitted valid and appropriate medical or religious exemptions with respect to the Testing Mandate (collectively, "Exemptions"), but to date, none of the Exemptions have been recognized or provided any relief to Plaintiffs.   It is anticipated than any future requests for exemptions from the Mandates will be similarly ignored or denied.

8.      All Plaintiffs are concerned regarding the safety of the purported "vaccines," repeated COVID testing, and mask wearing as required by the Mandates.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

---

[2] Plaintiffs Atkins, Dehner, Domanico, Parr, and Young.

9.     The COVID-19 vaccination is classified as genetic medical intervention. It carries both known and unknown risk of harm to Plaintiffs and others, such as serious illness and death.

10.    As a result of the Mandates, Plaintiffs are faced with a life-altering decision of either losing their jobs through CCSD, furthering their employment in a discriminatory manner, or receiving a Vaccine, testing, and/or masking that they fundamentally oppose and have the constitutional right to reject.

11.    The coercion that is occurring throughout CCSD regarding the Mandates has not only stripped Plaintiffs of their fundamental and constitutionally protected rights of bodily integrity, but has also resulted in being shunned by, and segregated from, their peers, if they make the protected decision to not become subjected to Mandates.

12.    Plaintiffs seek the issuance of an order to show cause, shifting the burden to Defendants to prove that Defendants' decision to reject scientifically accepted Prescreening methods meets a compelling State interest, and that such decision to reject accepted Prescreening science is narrowly tailored to avoid unnecessary infringement upon Plaintiffs' constitutional rights.

13.    Plaintiffs further seek declaratory relief that Defendants' unscientific decision to reject Prescreening science, in order to unscientifically propagate Defendants' one-size-fits-all Mandates, imminently threatens the lives of Plaintiffs, and others, and unlawfully segregates them based on their COVID-19 Recovered medical condition and natural mRNA genetic status, which is an unlawful infringement by Defendants upon Plaintiffs' constitutional rights that places Plaintiffs' lives and public health in jeopardy.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702.979.3565 ♦ FAX 702.362.2060

14.     Plaintiffs seek an injunction to restrain Defendants' from utilizing the discredited, repugnant tools of coercion and segregation of natural peoples in violation of Federal and State law.

**A. <u>The Mandates</u>**

15.     On July 30, 2021, Nevada Governor Steve Sisolak issued a Memorandum that was sent to "All State Employees" entitled "State Employee Mask and Testing Policy" (the "State Mandate").  *See,* **Exhibit B.**

16.     The State Mandate requires that "Everyone, including fully vaccinated individuals, must wear a mask in public indoor settings in counties with substantial or high transmission."  *See,* Exhibit B.

17.     As of November 22, 2021, Clark County is classified as having "high transmission" according to https://covid.cdc.gov/covid-data-tracker/#county-view|Nevada|32003|Risk|community_transmission_level.

18.     The mask policy under the State Mandate for state employees such as Plaintiffs is as follows:

> Effective immediately, all state employees, regardless of vaccination status, must wear a mask that covers the nose and mouth at all times that the employee is on duty, except:
>    1. When the employee is alone in a closed office or vehicle;
>    2. When the employee is outdoors and maintains at least six feet of distance from others;
>    3. When the employee is working remotely from home or other location where the employee is not in contact with the public or other employees; or,
>    4. Those employees working in a county that has low to moderate transmission rates (currently Storey, Humboldt, Lander, Eureka, and Pershing).
>
> Noncompliance with the mask policy for state employees is a cause for disciplinary or corrective action pursuant to NAC 284.650(19).

*See,* Exhibit B.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

19.     The State Mandate does, however, provide for medical exemptions for the mask policy, to wit:

> Employees who cannot wear a mask due to a medical condition must provide their human resources officer / department with documentation from a Nevada-licensed physician or other qualified healthcare provider that specifically indicates that the employee is unable to wear a mask. The greatest extent possible, the employee must use an alternative, such as a face shield.

20.     The State Mandate further includes a testing policy for state employees:

> Effective August 15, employees who are not fully vaccinated must be tested weekly for COVID- 19 and proof of testing and results must be submitted to their human resources officer/department…

> …Employees who fail to comply with testing requirements will be subject to progressive discipline…Proof of testing must be presented to either their immediate supervisor and/or Human Resources Officer/Department. Employees will not be given administrative leave time for testing, but employers are encouraged to authorize release time for employees who cannot get tested outside of work hours.

> … Noncompliance with the testing policy for state employees is a cause for disciplinary or corrective action pursuant to NAC 284.650(19).

*See,* Exhibit B, p.1.

21.     On or about August 4, 2021, CCSD issued its own version of mandatory masking and testing protocols for unvaccinated employees via the Testing Mandate.  *See,* **Exhibit C.**

22.     The Testing Mandate requires the following:

- All staff are required to wear face masks while inside school buildings/facilities, unless medical conditions prohibit use.
- All staff are required to wear face masks on all District buses, unless medical conditions prohibit use.
- Staff requiring an accommodation must contact the Office of Diversity and Affirmative Action/Americans with Disabilities Act/Title IX Programs at (702) 799-5087.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

- Staff are required to log in every workday to emocha Health for daily symptom monitoring.
- Staff should upload their COVID-19 Vaccination Record Card through emocha Health.
- Staff who do not upload their COVID-19 Vaccination Record Card to emocha Health will participate in required weekly mandatory COVID-19 testing outside of their contractual workday at designated District sites beginning August 9, 2021.

*See,* Exhibit C.

23.     With the Vaccine Mandate imminent, Plaintiffs and those similarly situated reasonably expect similar, egregious efforts to unlawfully impose unwanted, untested, and unproven health care. As such, this matter is ripe for adjudication as to both the Testing Mandate and the Vaccine Mandate.

**B. The "Vaccines"** [3]

24.     The Vaccines are inadequately tested, experimental and dangerous biological agents that have the potential to cause substantially greater harm than the SARS-CoV-2 virus and the COVID-19 disease itself.   According to data extracted from the Agency Defendants' Vaccine Adverse Events Reporting System ("VAERS"), 99% of all deaths attributed to vaccines in the first quarter of 2021 are attributed to COVID-19 Vaccines, and only 1% are attributed to all other vaccines. The number of vaccine deaths reported in the same period constitutes a 12,000% to 25,000% increase in vaccine deaths, year-on-year.  The Vaccines appear to be linked to a range of profoundly serious medical complications, including myocarditis, miscarriage, irregular vaginal bleeding, clotting disorders, strokes, vascular damage, and autoimmune disease.  Meanwhile, Pfizer, Moderna, and Janssen

---

[3] The "Pfizer-BioNTech COVID-19 Vaccine," "Moderna COVID-19 Vaccine," and the "Johnson & Johnson (Janssen) COVID-19 Vaccine" are collectively referred to as the "Vaccines").

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 • FAX 702 362 2060

1  enjoy statutorily conferred immunity from liability for any harm caused by their

2  experimental products.

3       25.    The American public, desperate for a return to normalcy following a

4  year of relentless psychological manipulation through fear-messaging regarding

5  SARS-CoV-2/COVID-19 and associated unprecedented deprivations of their

6  constitutional and human rights, are being told in a carefully orchestrated public

7  messaging campaign that the Vaccines are "safe and effective" and a "passport"

8  back to the freedoms they once enjoyed.   Dissenting medical opinion is

9  systematically censored.  Private sector employers and all levels of government are

10  offering dramatic incentives to accept the Vaccines, and jarring penalties for refusing

11  them.  In these conditions, it is not possible for Vaccine subjects to give voluntary

12  informed consent to the Vaccines, and the "warp speed" rollout of these dangerous,

13  untested biological agents to the American population constitutes non-consensual

14  human experimentation in violation of customary international law.

15       26.    Plaintiffs are unable and/or unwilling to subject themselves to the

16  requirements of the Mandates because they do not agree to be guinea pigs for the

17  untested Vaccines.

18       27.    Plaintiffs have a right to work, and that right is being trampled upon by

19  the Hobson's choice of either not working or being forced to inject themselves with

20  an untested chemical substance, undergoing repeated and unnecessary medical

21  testing, and hiding behind facial coverings that inhibit their ability to communicate

22  with and teach their students.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

28.     Plaintiffs are seeking additional declaratory relief including *inter alia* a determination that the Mandates are arbitrary and capricious, overly broad, and wholly unnecessary.

**The Employment Contracts**

29.     Upon information and belief, each Plaintiff executed a contract of employment with the Defendant CCSD that were executed by the CCSD Board of School Trustees (the "Employment Contracts", an exemplar of which is attached hereto as **Exhibit D**).

30.     Pursuant to the Employment Contracts, each Plaintiff:

> …agrees to fully perform professional services in accordance with the terms and conditions of the Negotiated Agreement between the Clark County School District and the Clark County Education Association.  The employee agrees to perform professional services in accordance with the calendar determined and adopted by the employer, which is incorporated by reference as though fully set forth herein.  In the event that this Contract is not performed in its entirety, the salary the employee receives shall be prorated in the same proportion as the number of school days worked is to the number of actual days of service required by the adopted calendar.  Deductions for absences shall be made according to the provisions of the Nevada Revised Statutes and the Negotiated Agreement.

*See,* Exhibit D at ¶3.

31.     Paragraph 5 of the Employment Contracts further states that "[a]ssignments involving additional pay for contract days beyond the normal contract year, extra duty, or special services may be made at any time during the life of this Contract."  *See,* Exhibit D, ¶5.

32.     The Negotiated Agreement between Defendant CCSD and the Clark County Education Association for 2018-2021 (the "Negotiated Agreement") is

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

incorporated by reference as though fully set forth in the Employment Contracts. *See,* Exhibit D, ¶11.  A copy of the Negotiated Agreement is attached hereto as **Exhibit E**.

33.    The Clark County Education Association (the "Union") is a union established for the benefit of teachers such as Plaintiffs.  While Plaintiffs are not direct members of the Union, by virtue of the Employment Contracts, the Negotiated Agreement applies to each Plaintiff.

34.    Pursuant to the Negotiated Agreement, classroom teachers such as Plaintiffs are required to work a seven (7) hour and eleven (11) minute workday, including a duty-free lunch period (a "Workday").  *See,* Exhibit E, ¶22-1.

35.    Paragraph 22-5 of the Negotiated Agreement states:

It is recognized that certain meetings for ***educational, not extra-curricular***, activities may be scheduled to extend beyond the day without additional compensation for the purposes listed below:

22-5-1    Attendance at general faculty meetings.

22-5-2    Special meetings may be called by the superintendent or school principal.  It is agreed, however, that there shall be no more than three (3) such meetings per school year.  Five (5) working days' notice shall be given.

*See,* Exhibit E, 22-5 (emphasis added).

36.    The mandated Testing of Plaintiffs is not for "educational" purposes, and thus must be compensated.

37.    Upon information and belief, Defendants take the position that Plaintiffs and those similarly situated are not entitled to pay for the time spent getting tested.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702.979.3565 ♦ FAX 702.362.2060

38.     On or about August 6, 2021, the Education Support Employees Association ("ESEA")[4] sent an email to all ESEA members asserting that CCSD is in fact legally obligated to pay employees for the time spent testing outside of the employees' regular work hours, including travel time.

39.     ESEA further noted that it was going to have to use its grievance process in the ESEA contract with CCSD to ensure that payment was properly made.

40.     As a result of ESEA's efforts, upon information and belief, CCSD has agreed to compensate all ESEA members for testing time outside of their regular work hours.

41.     To date, none of Plaintiffs have been compensated for their time spent getting tested under the Mandates.

42.     Article 32 of the Negotiated Agreement, entitled "Safety," states that:

> A teacher will not be required to perform any duty or act which threatens the teacher's…physical safety or well-being ***except normal risks involved in carrying out teaching duties***.

*See*, Exhibit E, ¶32-1 (emphasis added).

43.     The Mandates are not within the "normal risks involved in carrying out teaching duties."

44.     The Mandates undeniably threaten Plaintiffs' physical safety and well-being.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

---

[4] The ESEA is the union for educational support staff, who are also subject to the Mandates.

45.   Article 33 of the Negotiated Agreement, entitled "Equitable Treatment," states that "[a]ll employees have a right to work in an environment free from unlawful discrimination…".

46.   However, as a result of the Mandates, Plaintiffs are being singled-out and discriminated against in a number of ways.

## II.   THE PARTIES

### A. Plaintiffs

47.   Each of the Plaintiffs are teachers within CCSD. Specifically:

| Last Name | First Name | Years with CCSD (approx.) | Current School | Grade Level/Subject |
|---|---|---|---|---|
| Atkins | Tonia | 3 | Becker Middle School | 7th Grade Science |
| Barreto | Mariela | 4 | Don Hayden Elementary School | 3rd-5th Grade Teacher |
| Bruckner | Bonnie | 15 | Faiss Middle School | 7th Grade math |
| Dehner | Paula | 25 | Virgin Valley Elementary School | PE |
| Domanico | Ernest | 12 | Sig Rogich Middle School | 7th Grade Math |
| Filutze | Lisa | 25 | Helen Smith Elementary School | Art K-5 |
| Garrison | Athena | 14 | Fay Herron Elementary School | Literacy Coach |
| Guido | Joy | 20 | Kay Carl Elementary School | 5th Grade Math |
| Harris | Jennifer | 20 | Berkeley Bunker Elementary School | 1st Grade |
| Kralick | Tammy | 25 | O'Roarke Elementary School | 4th Grade |
| McGartland | Claire | 5 | Marion Earl Elementary School | Special Education |
| Moreo | Carole | 25 | Burkholder Middle School | Technology Grades 6-8 |
| Murphy | Lynda | 26 | Sheila Tarr Academy of International Studies | 2nd Grade |
| Parr | Carrie | 20 | O'Roarke Elementary School | 4th Grade |
| Phillips | Jennifer | 20 | Paul E. Culley Elementary School | Math/Tech Coach |

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

| Last Name | First Name | Years with CCSD (approx.) | Current School | Grade Level/Subject |
|---|---|---|---|---|
| Rhodes | Cathy | 24 | Edwards Elementary School | Pre-K |
| Varos | Suzanne | 23 | Hyde Park Middle School | 6th, 7th, and 8th Grades |
| Young | Jacqueline | 1 | Frank Kim Elementary School | 3rd Grade |

48.     To date, Plaintiffs Atkins, Dehner, Domanico, Parr, and Young have already recovered swiftly from COVID-19 (the "COVID-Recovered Plaintiffs") and continue to have robust natural immunity that is superior to the vaccine-induced immunological response now mandated by Defendants.

49.     To date, Plaintiffs Barreto, Comadena Jr., and Murphy have submitted medical exemptions from their healthcare providers and/or religious exemptions to CCSD, but are yet to receive any relief from the Mandates (the "Exemption Plaintiffs").

**B.  Defendants**

50.     Defendant CLARK COUNTY SCHOOL DISTRICT is a state agency.

51.     Defendant DR. JESUS F. JARA ("Superintendent Jara") is the current Superintendent of Defendant CCSD. He is being sued in his official capacity.

52.     JOHN AND JANE DOES I - V, are as yet unknown agencies and individuals who violated the law and harmed Plaintiffs.

53.     The Defendants have coordinated, collaborated, planned and conspired, each with the others, and aided and abetted, the unlawful actions described herein.

/ / /

/ / /

/ / /

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

III.     **JURISDICTION, VENUE, & STANDING**

54.     This Court exercises subject matter jurisdiction under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States.

55.     This Court has the authority to the requested declaratory relief under 28 U.S.C. § 2201, and the requested injunctive relief under 28 U.S.C. § 1343(a).

56.     This Court is the appropriate venue for this litigation pursuant to 28 U.S.C. § 1391(b) because the Defendants are domiciled in this District.

IV.     **STATEMENT OF FACTS**

A. **The Vaccines Were Not Supported by Adequate Testing**

57.     The typical vaccine development process takes between 10 and 15 years and consists of the following sequential stages - research and discovery (2 to 10 years), pre-clinical animal studies (1 to 5 years), clinical human trials in four phases (typically 5 years). Phase 1 of the clinical human trials consists of healthy individuals and is focused on safety. Phase 2 consists of additional safety and dose-ranging in healthy volunteers, with the addition of a control group. Phase 3 evaluates efficacy, safety and immune response in a larger volunteer group, and requires two sequential randomized controlled trials.  This Phase typically requires several years because it can take years for a new vaccine's side effects to present.[5]  Phase 4 is a larger scale investigation into longer-term safety. Vaccine developers must follow this process in order to be able to generate the data the FDA needs in order to assess the safety and effectiveness of a vaccine candidate.

---

[5] *See Vaccine Testing and the Approval Process*, CDC (May 1, 2014), *available at* https://www.cdc.gov/vaccines/basics/test-approve.html  (last visited November 22, 2021).

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

58.      This 10–15-year testing process has been abandoned for purposes of the Vaccines. The first human-to-human transmission of the SARS-CoV-2 virus was not confirmed until January 20, 2020, and less than a year later both mRNA Vaccines had EUAs. For the first time in history, novel mRNA technology was being injected into millions of human beings.

59.      There are no long-term clinical studies for the COVID-19 Vaccines. Consequently, there is no way of knowing whether or not vaccinated people will suffer severe adverse side effects in the future. Because clinical trial participants in the placebo (control) group have subsequently been given the option of getting vaccinated (and a number of them chose to be vaccinated), there is no longer a statistically viable control group for a study of the long-term adverse effects of the Vaccines.

60.      All of the stages of the Vaccines' testing have been compressed in time, abbreviated in substance, and are overlapping. This dramatically increases the risks of the Vaccines. Plaintiffs' investigation indicates that Moderna and Pfizer designed their Vaccines in only two (2) days. It appears that pharmaceutical companies did not independently verify the genome sequence that the People's Republic of China released on January 11, 2020. It appears that pharmaceutical companies studied the Vaccines for only 56 days in macaques, 28 days in mice, and then halted animal studies. It appears that pharmaceutical companies discarded their control groups receiving placebos, squandering the opportunity to learn about the rate of long-term complications, how long protection against the disease lasts, and if the Vaccines inhibit transmission. A number of studies were deemed unnecessary and not performed prior to administration in human subjects,

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

including single dose toxicity, toxicokinetic, genotoxicity, carcinogenicity, prenatal and postnatal development, offspring, local tolerance, teratogenic and postnatal toxicity and fertility.  The American public unaware and misinformed about these dramatic departures from the standard testing process, and the associated risks.

61.     Pfizer recognizes that the long-term adverse effects of the Pfizer-BioNTech COVID-19 vaccine are not currently known.  In its Agreement to supply Pfizer-BioNTech COVID-19 vaccines to the government of a European country, Pfizer's subsidiary required the purchasing government, in paragraph 5.5 of the Agreement, to acknowledge "that the long-term effects and the efficacy of the Vaccine are not currently known and that there may be adverse effects of the Vaccine that are not currently known." It is reasonable to assume that the same provision was included in Pfizer's agreements with the governments of other countries as well.[6]

62.     There is currently much discussion regarding whether "booster" shots for the Vaccines are needed, including directly from the Vaccine manufacturers themselves.  This fact appears to be an admission by all three companies that their Vaccines do not provide long-term protection against COVID-19.

63.     America's Frontline Doctors ("AFLDS") medico-legal researchers have analyzed the accumulated COVID-19 Vaccine risk data, and have found significant concerns with, and negative results caused by, the Vaccines as outlined herein.

---

[6] *See,* Manufacturing and Supply Agreement between Pfizer Export B.V. and Albania Ministry of Health and Social Protection, *available at:* http://ti-health.org/wp-content/uploads/2021/05/Albania-Pfizer.pdf (last accessed November 22, 2021).

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ◆ FAX 702 362 2060

**B.  <u>Natural Immunity is a Scientifically Proven Better Guard than the Vaccines</u>**

64.    Recent medical data from Israel determined that people who received the Pfizer Vaccine were 6.72 times *more likely* to suffer a subsequent infection when compared to those with naturally acquired immunity.[7]

65.    Israeli data further indicates that the Pfizer Vaccine protection is short-lived compared to natural immunity and weakens much faster. As of July 2021, vaccine recipients from January 2021 exhibited only 16% effectiveness against infection and 16% protection against symptomatic infection, increasing linearly until reaching a level of 75% for those vaccinated in April.[8]

66.    Early data also suggests that naturally acquired immunity provides greater protection against both the Delta and Gamma variants than Vaccine-induced immunity. A recent analysis of an outbreak among a small group of mine workers in French Guiana found that 60% of fully vaccinated miners suffered breakthrough infections compared to *zero* among those with natural immunity.[9]

67.    Israeli data also suggests that the protection Pfizer grants against infection is short-lived compared to natural immunity and degrades significantly faster. In fact, as of July 2021, vaccine recipients exhibited only 16% effectiveness against infection and 16% protection against symptomatic infection for those

---

[7] David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection*? (Jul. 13, 2021), *available at* https://www.israelnationalnews.com/News/News.aspx/309762 (last visited November 22, 2021).

[8] *See* Nathan Jeffay, *Israeli, UK data offer mixed signals on vaccine's potency against delta strain*, THE TIMES OF ISRAEL (July 22, 2021), *available at* https://www.timesofisrael.com/israeli-uk-data-offer-mixed-signals-on-vaccines-potency-against-delta-strain/ (last visited November 22, 2021).

[9] Nicolas Vignier, et al., *Breakthrough Infections of SARS-CoV-2 Gamma Variant in Fully Vaccinated Gold Miners, French Guiana, 2021*, 27(10) EMERG. INFECT. DIS. (Oct. 2021), *available at* https://wwwnc.cdc.gov/eid/article/27/10/21-1427_article (last visited November 22, 2021).

1    receiving a vaccination in January 2021. This protection increased linearly until

2    reaching a level of 75% for those vaccinated in April 2021.[10]

3    **C.  <u>Vaccines Do Not Prevent the Transmission of COVID-19</u>**

4    68.    A person's vaccination status does not appear to significantly impact

5    the COVID-19 transmissibility. Recently, the CDC reported that "new scientific data"

6    which indicated that vaccinated people who experienced breakthrough infections

7    carried similar viral loads to the unvaccinated (but not naturally immune), causing

8    the CDC to deduce that vaccinated people transmit the virus at troubling levels.[11]

9    69.    Specifically, the CDC expressly stated that their research unveiled "a

10    high [COVID-19] attack rate even in fully vaccinated persons."[12]

11    70.    This is especially true when looking at new variants of COVID-19 such

12    as the Gamma and Delta variants.[13]

13    71.    Worse, experts opine that some or all of the Vaccines place unnatural

14    pressure on COVID-19 producing new, more virulent strains.

15    **D.  <u>The Vaccines Have Been Demonstrated to Present Significant Negative</u>**
      **<u>Health Impacts and Risks</u>**

16    72.    Upon information and belief, the Vaccines carry grave risks, cause, or

17    have also been demonstrated to cause and/or exacerbate a number of health

18    / / /

---

[10] *See* Nathan Jeffay, *Israeli, UK data offer mixed signals on vaccine's potency against delta strain*, THE TIMES OF ISRAEL (July 22, 2021), *available at* https://www.timesofisrael.com/israeli-uk-data-offer-mixed-signals-on-vaccines-potency-against-delta-strain/ (last visited November 22, 2021).
[11] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?"*, WASHINGTON POST (July 28, 2021), *available at* https://www.washingtonpost.com/health/breakthrough-infections-cdc-data/2021/07/28/dcaaa6b2-efce-11eb-a452-4da5fe48582d_story.html (last visited November 22, 2021).
[12] *Id.*
[13] *Id., see also,* https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (last accessed November 22, 2021).

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702.979.3565 ♦ FAX 702.362.2060

issues, including, but not limited to:

      a. Reproductive Health issues, including miscarriage, irregular vaginal bleeding, and pregnancy complications;

      b. Vascular disease;

      c. Autoimmune disease;

      d. Neurological Damage;

      e. Chronic Disease;

      f. Antibody Dependent Enhancement; and

      g. Death.

    73.    These risks (along with countless others) have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

**E. There are Adequate, Approved, and Available Alternatives**

    74.    Despite the misinformation being disseminated in the press – and, at times, by the Defendants – there are numerous alternative safe and effective treatments for COVID-19.

    75.    These alternatives are supported by over 300 studies, including randomized controlled studies. Medical professionals have publicly attested, and many have testified under oath, as to the safety and efficacy of the alternatives. Globally, and in the United States, treatments such as Ivermectin, Budesonide, Dexamethasone, convalescent plasma and monoclonal antibodies, Vitamin D, Zinc, Azithromycin, Hydroxychloroquine, Colchicine and Remdesivir are being used to great effect, and they are safer than the COVID-19 Vaccines.[14]

---

[14] Numerous studies can be reviewed here: https://c19early.com (last visited November 22, 2021).

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

**F.** **The Significant, Proven Risks of the Vaccines to the COVID-Recovered**

76.     Medical studies show severe Vaccine side effects in persons previously infected with COVID-19. Groups of scientists are demanding improved pre-assessment due to vaccine-driven disease enhancement in the previously infected.

77.     Medical evidence exists that there is a much stronger[15] (10-20 times) antibody response to the Vaccines if a person has previously had the virus. This antibody response is too strong and overwhelms the recipient's immune system.[16]

78.     Consequently, medical studies show severe side effects post-vaccination in those persons with prior COVID-19 infection.[17] The risk to the Covid-recovered is substantial and suppressed in the national news although sometimes reported in local news.[18]

**G.** **Natural Immunity and the Necessity of Prescreening**

79.     Medical studies at the Cleveland Clinic show that previously infected individuals do not benefit from Covid-19 vaccines.[19]   Medical studies further show that previously infected individuals maintain their immunity.[20] Medical studies also

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

---

[15]  https://www.medrxiv.org/content/10.1101/2021.04.15.21252192v1  (last visited November 22, 2021).

[16] n. 5, id.

[17]  https://www.medrxiv.org/content/10.1101/2021.02.26.21252096v1  (last visited November 22, 2021).

[18]https://newjersey.news12.com/new-jersey-man-develops-heart-issues-after-1st-dose-of-pfizer-covid-19-vaccine (last visited November 22, 2021).

[19]  https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3   (last visited November 22, 2021).

[20]https://www.theblaze.com/news/johns-hopkins-professor-ignore-cdc-natural-immunity-works?utm_source=theblaze-breaking&utm_medium=email&utm_campaign=20210527Trending-CDCHopkins&utm_term=ACTIVE%20LIST%20-%20TheBlaze%20Breaking%20News  (last visited November 22, 2021).

show that following natural infection, lifelong immunity from COVID-19 is expected.[21],[22] and that previously infected persons maintain robust immunity.[23]

80.      There is abundant evidence that the laws of immunology continue to function normally during COVID (meaning those who are previously recovered from such an infection have acquired the ability to recognize disease and can effectively neutralize the infection before it takes hold) as evidenced by the fact that persons who have had SARS-CoV-1, a virus which is 22% dissimilar to the current strain, are still immune from SARS-CoV-2 18 years later.[24] Laypersons are misled to believe that when antibodies gradually diminish immunity is gone when, in fact, immunity remains[25] quiescent deeper in the body, in the bone marrow[26], plasma, ready to be activated should the threat reemerge. This is normal immunology.

81.      Groups of scientists have demanded better pre-assessment due to "vaccine-driven disease enhancement" in groups excluded from trials,[27] such as the previously infected.

82.      Vaccinating without prescreening poses immediate life-threatening harm to Plaintiffs.[28] [29]

83.      Prescreening must be accomplished in the traditional, multi-stepped manner:

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

---

[21] https://www.nature.com/articles/d41586-021-01442-9 (last visited November 22, 2021).
[22] https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00782-0/fulltext (last visited November 22, 2021).
[23] https://www.nature.com/articles/s41467-020-20247-4 (last visited November 22, 2021).
[24] https://www.nature.com/articles/s41586-020-2550-z (last visited November 22, 2021).
[25] https://www.medpagetoday.com/infectiousdisease/covid19/92836 (last visited November 22, 2021).
[26] https://www.nature.com/articles/s41586-021-03647-4 (last visited November 22, 2021).
[27] https://authorea.com/doi/full/10.22541/au.162136772.22862058 (last visited November 22, 2021).
[28] https://www.news-medical.net/news/20210511/Severe-COVID-19-linked-to-genetic-clotting-predisposition.aspx (last visited November 22, 2021).
[29] https://www.medrxiv.org/content/10.1101/2021.05.04.21256617v1.full.pdf (last visited November 22, 2021).

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

a. Obtain relevant personal and family medical history including prior COVID symptoms and prior testing;

b. Antibody and T-Detect testing from indeterminate persons; and

c. Rapid PCR screening test on all persons (using at least the standard cycle threshold, currently Quest 40, Lab Corp 38, most Health Departments use 40-45).[30] [31]

84.     If prescreening results are positive, the potential recipient must be excluded to protect the health, if not the life, of the positively screened potential recipients of the Vaccines.

85.     Defendants mandating the experimental COVID-19 Vaccines to persons in the COVID-recovered subset of the population without prescreening poses immediate, irreparable, life-threatening harm to Plaintiffs.

**H.   The Suppression of Truth and Informed Consent.**

86.     The Associated Press, Agence France Press, British Broadcasting Corporation, CBC/Radio-Canada, European Broadcasting Union (EBU), Facebook, Financial Times, First Draft, Google/YouTube, The Hindu Times, Microsoft, Reuters, Reuters Institute for the Study of Journalism, Twitter, The Washington Post and The New York Times all participate in the "Trusted News Initiative" which has agreed to not allow any news critical of the Vaccines.

87.     Individual physicians experience censorship on social media platforms (e.g., Twitter, Facebook, Instagram, TikTok), the modern day "public square." AFLDS recorded innumerable instances of social media deleting scientific content

---

[30] https://www.fda.gov/media/136231/download (last visited November 22, 2021).
[31] https://files.labcorp.com/labcorp-d8/2020-04/LabCorp-COVID-EUAsum3.pdf (last visited November 22, 2021).

posted by AFLDS members that runs counter to the prevailing Vaccine narrative, then banning them from the platform altogether as users. Facebook has blocked the streaming of entire events at which AFLDS Founder Dr. Simone Gold has been an invited guest, prior to her uttering a word. Other doctors have been banned for posting or tweeting screenshots of government database VAERS.

88.     The censorship extends to medical journals. In an unprecedented move, the four founding topic editors for the *Frontiers in Pharmacology* journal all resigned together due to their collective inability to publish peer reviewed scientific data on various drugs for prophylaxis and treatment of COVID-19.

89.     In many instances, highly publicized attacks on early treatment alternatives seem to be done in bad faith. For example, one study on Hydroxychloroquine overdosed studied participants by administering a multiple of the standard prescribed dose, and then reported the resulting deaths as though they were not a result of the overdose. The 27 physician-scientist authors of the study were criminally investigated. Still, the Journal of the American Medical Association did not retract the article.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Declaratory Relief Under 28 U.S.C. § 2201**
**United States Constitution 14th Amendment**

90.     Plaintiffs incorporate the allegations in the preceding paragraphs as though fully set forth herein.

91.     The United States Supreme Court recognized "[t]he Constitution was adopted in a period of grave emergency. Its grants of power to the Federal Government and its limitations of the power of the States were determined in the

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702.979.3565 ♦ FAX 702.362.2060

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

light of emergency and they are not altered by emergency." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425 (1934) (emphasis added). The COVID-19 pandemic highlights the risk of permitting Constitutional rights to be cast side once an emergency arises.

92.   The Mandates violate the fundamental liberty rights protected by, *inter alia*, the Fourteenth Amendment to the U.S. Constitution, which include and hinge upon the  right of personal autonomy and bodily integrity, *see, e.g., Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), and the right to reject medical treatment, *Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261 (1990).

93.   Historically, many have understood *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), to authorize near *carte blanche* for government to mandate vaccinations in response to pandemics on the basis that such individual liberty must yield to the common good—all with great deference to legislatures and little or no evidence contrary to their choice reviewed. Such cases entitled to higher scrutiny have instead received the highly deferential *Jacobson* analysis. But even *Jacobson* was not absolute *carte blanche* because it recognized an exception where rights are violated or a mandate is unreasonable for not advancing health:

> If there is any . . . power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, [1] has no real or substantial relation to those objects, or [2] is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 31 (citations omitted).

94.   *Jacobson*'s analysis doesn't resemble today's jurisprudence, which has less or no deference where rights are involved and requires evidence. Since

*Jacobson*, Fourteenth Amendment liberty has been recognized as strongly protecting contraception, *Griswold v. Connecticut*, 381 U.S. 479 (1965), abortion, *Roe v. Wade*, 410 U.S. 113 (1973), same-sex marriage, *Obergefell v. Hodges*, 576 U.S. 644 (2015), and refusing medical treatment, *Cruzan*, 497 U.S. 261. And *Jacobson* was part of a Progressive Era emphasis on enhancing governmental power at the expense of the individual that included a eugenics movement culminating in the infamous decision approving involuntary sterilization in *Buck v. Bell*, 274 U.S. 200 (1927), which cited *Jacobson* as authority for its decision. *Id.* at 207. Those attitudes have since been widely repudiated along with their low valuation of individual liberty.

95.    In 2020, in light of these discrepancies between *Jacobson* and current jurisprudence, the Supreme Court implicitly narrowed the perceived breadth of *Jacobson* in *Roman Catholic Diocese of Brooklyn v. Cuomo*. 141 S. Ct. 63 (2020) (per curiam),  by holding that (i) *normal* strict scrutiny applied to a Free Exercise Clause challenge to non-neutral pandemic restrictions on the number people in houses of worship, (ii) challengers had likely merits success and other injunction factors weighed in their favor, and (iii) this justified an injunction during appeal, *id.* at 66-69. Consequently, the Court simply abandoned the *Jacobson* framework— highlighted by high deference and little evidentiary analysis—by applying its *current* jurisprudence. Strict scrutiny requires the government to prove its restriction to be the least restrictive means to further a compelling interest, and to do so by evidence. The modern scrutiny levels apply to challenges to government actions that infringe fundamental rights including restrictions implemented under pandemic-fighting authority, i.e., not *Jacobson*'s analysis.

96.   *Roman Catholic Diocese* was preceded by a similar case (church occupancy limits in the pandemic) in *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2630 (2020) (Mem. Op.). There Justice Alito dissented, joined by Justices Thomas and Kavanaugh, noting that "at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules," "[b]ut a public health emergency does not give . . . public officials *carte blanche* to disregard the Constitution as long as the medical problem exists." *Id.* at 2605. Rather, "[a]s more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights." *Id.* That dissenting view was essentially adopted by *Roman Catholic Diocese*, meaning that "blunt rules" may be permitted initially, but fine-tuning to actual scientific evidence is then required—requiring an *evidence-focused* inquiry in judicial review. Applying the normally required, current jurisprudence in that case required the government to justify itself under strict scrutiny, which eschews blunt rules and mandates narrow tailoring to the least restrictive means to further a compelling interest.

97.   Accordingly, *Jacobson*'s analysis does not control here. States no longer have near *carte blanche* to impose restrictions in the name of preventing pandemics, Instead, the applicable scrutiny under *today's* jurisprudence applies, with evidence clearly admissible and needed to determine whether government action meets the relevant level of scrutiny. And even were *Jacobson* deemed yet viable and applicable here, it recognized an exception where restrictions violate rights or are unreasonable, e.g., by not actually promoting public health, and *Roman Catholic Diocese* demonstrated *Jacobson*'s extreme deference to be archaic.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

98.   As the Mandates are a substantial burden, Defendants must prove narrow tailoring to a compelling interest, not a general interest, that *justifies mandatory vaccinations, testing and masking*. While government may have a general interest in mitigating COVID, there is no compelling interest needed to justify the Mandates.

99.   Even if there were a compelling interest in the Mandates, the Mandates are not narrowly tailored to such an interest. For example, the Mandates ignore individual factors increasing (older age, co-morbidities) or decreasing (having had COVID) Plaintiffs' risks to themselves or to others. Mandates for all is repugnant to the notion of narrow tailoring.

100.   Furthermore, the Mandates fail modern rational basis scrutiny and under *Jacobson's* exemption, since the Mandates are "unreasonable" and have "no real or substantial relation" "to protect[ing] the public health." 197 U.S. at 31, *i.e.*, it goes "beyond what [i]s reasonably required for the safety of the public," *Id.* at 28. The same evidence that shows there is no compelling interest or narrow tailoring with the Mandates shows that they fail even under *Jacobson.*

101.   Under *today's* jurisprudence, even rational-basis review, applicable for example to economic regulations, is "not toothless." *See, e.g.*, *Mathews v. Lucas*, 427 U.S. 495, 510 (1976) (citing, e.g., *Jimenez v. Weinberger*, 417 U. S. 628 (1974); *Frontiero v. Richardson*, 411 U. S. 677, 691 (Stewart, J., concurring in judgment, Powell, J., concurring in judgment)); *Reed v. Reed*, 404 U.S. 71 (1971)). Even under rational-basis review there must be "a sufficient factual context for [a court] to ascertain some relation between [what the restriction does] and the purpose it served," *Romer v. Evans*, 517 U.S. 620, 632-33 (1996), so the judiciary definitely

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

has power to weigh evidence considered by the legislature and hear expert testimony on competing views. Thus, there must be, demonstrably, "a rational relationship to an independent and legitimate legislative end." *Id.* at 633.

102.   Furthermore, the Mandates clearly demonstrate the illogical position taken by the Defendants.  In some instances, the Mandates require masks and testing.  For that to be rational, it must be presumed that those methods work for preventing virus spread.  But if those work, there is no need for vaccination.  The Mandates blur four distinct groups: (1) those who have had COVID and who need no vaccination for their sake or others'; (2) those who have COVID, who can and should be quarantined to protect others, after which they will have natural immunity; (3) those who have not had and do not have COVID and are unvaccinated given their choice; and (4) those who are vaccinated.  No protection is needed against the first two groups, other than quarantining those who actually have COVID.  Others can protect themselves against the third group if they so choose, by masking, distancing, and/or getting vaccinated. The fourth group should already have protection if the Vaccines are highly effective as claimed. There is therefore no reasonable basis to invade a person's physical autonomy and bodily integrity by mandating vaccinations across these groups in the name of an ethereal, unquantifiable "safety" benefit to unnamed persons. The Mandates, when viewed with the current state of knowledge about COVID, have no real, substantial relation to protecting public health.

103.   The Constitutional Right to Bodily Integrity is well settled in law and ethics:

a.    "It cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing []

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

medical treatment." *Cruzan v Director, Missouri Dept of Health (1990) 497 US 261, 279.*

b.      "Informed consent to medical treatment is fundamental in both ethics and law. Patients have the right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care. Successful communication in the patient-physician relationship fosters trust and supports shared decision making." Citation: American Medical Association (2020). AMA Principles of Medical Ethics: I, II, V, VIII. Informed Consent. https://www.ama-assn.org/delivering-care/ethics/informed-consent.

c.      "As with all forms of medical therapy, informed consent must precede vaccination administration."[32].

d.      "Coerced consent to a medical procedure violates the medical ethics of informed consent and informed refusal, as for example where an individual who has been coerced to consent to injection of biotechnology, due to governmental threat of loss of access to basic necessities of life such as food and medical care, cannot be presumed to have provided lawful informed consent to the injection."[33]

104.    Plaintiffs are the only competent persons able to provide consent/refusal to the injection of COVID-19 vaccines into themselves. Neither Defendants nor third parties (such as CCSD or the State of Nevada) are able to provide such consent/refusal on behalf of Plaintiffs, nor can Defendants or third parties waive Plaintiffs' rights to informed consent/refusal of COVID-19 vaccines. Because Defendants have indicated that consent to injection of a COVID-19

---

[32] The American College of Obstetricians and Gynecologists, Committee on Ethics, Ethical Issues With Vaccination for the Obstetrician–Gynecologist, Committee Opinion Number 564, May 2013, *(Reaffirmed 2016)* https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/07/ethical-issues-with-vaccination-in-obstetrics-and-gynecology (Last accessed November 22, 2021).

[33] Bi, S. and Klusty, T (2015). Forced Sterilizations of HIV-Positive Women: A Global Ethics and Policy Failure. *AMA J Ethics* 17(10):952-957. doi: https://journalofethics.ama-assn.org/article/forced-sterilizations-hiv-positive-women-global-ethics-and-policy-failure/2015-10 (Last accessed November 22, 2021).

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

vaccine is an imminent condition of their ongoing employment and future livelihood, Plaintiffs' fundamental rights are in jeopardy, and, so, Plaintiffs seek declaratory relief to clarify their rights, and to, thereby, prevent immediate harm.

105.   This real and concrete controversy exists between Plaintiffs and Defendants, in that Defendants contend that they have the right, the power, and the authority to require Plaintiffs' coerced vaccination as a condition of continuing employment (and hence control over Plaintiffs' current and future livelihood), and Plaintiffs maintain that such coercion is duress, because they have the fundamental constitutional and statutory right to refuse vaccination without disruption of their employment and current and future livelihood.

106.   This actual controversy between Defendants and Plaintiffs centers upon the lives and health of Plaintiffs.

107.   By way of example only, abundant scientific medical evidence exists showing that the vaccination of individuals who have had the virus and have recovered, or who currently have the virus, will result in serious health issues, including death to those individuals.

108.   Furthermore, as set forth herein, the Vaccines themselves pose a threat to those receiving it, whether or not they have recovered from COVID-19.

109.   A dispute has arisen, and actual controversy now exists between Plaintiffs and the State Defendants, with respect to the enforceability of the Mandates. Therefore, an actual controversy exists relative to the legal duties and rights of the respective parties, which Plaintiffs request the Court to resolve.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ◆ FAX 702 362 2060

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702.979.3565 ♦ FAX 702.362.2060

110.    Defendants' actions have created an actual justiciable controversy ripe for judicial determination between Plaintiffs and Defendants with respect to the Defendants' ability to force Plaintiffs to be vaccinated in order to keep their jobs.

111.    All of the rights and obligations of the parties arose out of one series of events or happenings, all of which can be settled and determined in a judgment in this one action. Plaintiffs allege that an actual controversy exists between the parties under the circumstances alleged. A declaration of rights, responsibilities and obligations of the parties is essential to determine their respective obligations in connection with the arbitrary and capricious nature and questionable enforceability of the Mandates such that Plaintiffs have no true and speedy remedy at law of any kind.

112.    Plaintiffs seek declaratory relief that Defendants' Mandates constitute an illegal and unscientific infringement upon Plaintiffs' constitutional rights.

## SECOND CAUSE OF ACTION

### Injunctive Relief Under 42 U.S.C. § 1983
### United States Constitution 14th Amendment

113.    Plaintiffs incorporate the allegations in the preceding paragraphs as though fully set forth herein.

114.    For Plaintiffs, the COVID-19 vaccination is experimental, ineffective, and dangerous.

115.    Plaintiffs cannot lawfully be coerced under duress to participate in the human medical experiment that is Operation Warp Speed, that Defendants have piggybacked their vaccine mandate on. Plaintiffs' protected right to bodily integrity is secured by the Due Process Clause of the United States Constitution, allowing Plaintiffs to navigate their employment with CCSD free from forced medical

experimentation and segregation based on medical condition and genetic status.

116.   Plaintiffs have the 14th Amendment Due Process right to be free from Defendants placing Plaintiffs in a situation of involuntary vaccination, testing and/or masking requirements, which constitute a position of actual, particularized danger based upon the deliberate indifference of Defendants to a known and obvious danger of COVID-19 vaccine injury, as well as negative health effects and dangers of repeated and ongoing testing and masking.

117.   Defendants' deliberate indifference to the known and obvious dangers (including but not limited to Defendants' inability to quantify the risks of the medical procedures they mandate) creates and exposes Plaintiffs to health dangers, the intensity of which Plaintiffs would not have otherwise faced. Defendants' rejection of science makes Plaintiffs more vulnerable to injury.

118.   Pursuant to the Mandates, Plaintiffs, and each of them, will be required by Defendants to be vaccinated or lose their employment.

119.   Pursuant to the Mandates, Plaintiffs will lose their right to choose their health care.

120.   The right to employment and to choose healthcare are protected liberties under the United States Constitution.

121.   Plaintiffs' current and future injuries as herein stated are reasonably foreseeable to Defendants.

122.   Defendants are state actors, and have instituted or imminently intend to institute the Mandates under color of law.

123.   The forcible administration of the COVID-19 Vaccines, unnecessary and unreliable testing and masking requirements, which result in penalty

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

of discipline, including termination from their employment with CCSD, would deprive Plaintiffs of their substantive due process rights as described herein.

124.   The harm to Plaintiffs cannot be adequately redressed in the event that the Mandates are carried out.

125.   Unless Defendants are enjoined, Plaintiffs will be irreparably harmed, which harm includes, but not by way of limitation, death, or other serious illness, and the loss of fundamental State and Federal constitutionally protected rights.

### THIRD CAUSE OF ACTION

**Violation of United States Constitution 14th Amendment /
Unconstitutional Conditions Doctrine**

126.   Plaintiffs incorporate the allegations in the preceding paragraphs as though fully set forth herein.

127.   Where a constitutional right "functions to preserve spheres of autonomy…the [u]nconstitutional conditions doctrine protects that sphere by preventing governmental end-runs around the barriers to direct commands." *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2005) *quoting,* Kathleen M. Sullivan, Unconstitutional Conditions, 450 F.3d 867 102 Harv. L.Rev. 1413, 1492 (1989).

**Freedom of Religion**

128.   The unconstitutional conditions doctrine is well-established in the context of employment—especially where First Amendment rights (such as freedom of religion) are implicated. *See, e.g. Zeitchick v. Lucey,* 495 Fed.Appx. 792, 794 (9th Cir. 2012).

129.   "Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."  *Thomas v. Review Bd. Of Ind. Employment Sec. Div.,* 450 U.S. 707, 717-8 (1981).

130.   "The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task…However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question…religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection". *Id. at 714.*

131.   "[C]itizens do not surrender their First Amendment rights by accepting public employment." *Jordahl v. Brnovich*, 336 F.Supp.3d 1016, 1044 (D. AZ 2018), *citing, Lane v. Franks*, 573 U.S. 228, 134 S.Ct. 2369, 2374 (2014). Thus, the premise that government employment contracts may be subjected to any condition "has been unequivocally rejected." *Jordahl, quoting, Pickering v. Bd. of Edu. of Township High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563, 568, 88 S.Ct. 1731 (1968).

132.   While the Mandates purport to have religious exemptions to date no such exemptions appear to be recognized, as the Religious Exemption Plaintiffs have not been excused from the requirements of the Mandates.

**Right to Privacy**

133.   The unconstitutional conditions doctrine also applies, in the employment context, to other constitutional protections, including the constitutional "right to privacy" outlined in *Whalen v. Roe* (429 U.S. 589, 599, 97 S.Ct. 869 (1977)), and to Fourth Amendment rights; as well as—in the non-employment context—to Fifth Amendment property rights. *See, Koontz v. St. Johns River Water*

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ◆ FAX 702 362 2060

*Management District,* 133 S.Ct. 2586, 570 U.S. 595, 186 L.Ed.2d 697 (2013).

134. "[T]he government may not condition public employment upon compliance with unconstitutional conditions." *Shuman v. City of Philadelphia,* 470 F.Supp. 449, 457 (D. PA. 1979). "The unconstitutional conditions doctrine vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id.; citing, Koontz v. St. Johns River Water Management District*, 133 S.Ct. 2586.

135. The right to privacy takes two somewhat different forms: the right to personal autonomy (i.e., the right to make certain choices free of unwarranted government interference) and the right to confidentiality (i.e., the right to hold certain information private). *See, e.g., Whalen,* 429 U.S. at 598-600. Here, both forms of privacy are squarely at issue under the Mandates.

136. While there may be instances where a government employer such as CCSD has reason to question whether an employee is medically fit to work, and as such, the divulgence of medical information may be warranted (*see, e.g., Gargiul v. Tompkins*, 704 F.2d 661 (2d Cir. 1983)), this is not such a case. Whether or not a Plaintiff has been vaccinated, undergoes COVID testing, and/or wears a mask has no bearing on the Plaintiff's fitness to teach students.

137. The reasoning of the *Shuman* Court, while dealing with informational privacy, is equally applicable to the Mandates at issue here:

> …this policy's interference with privacy rights "goes far beyond what might be justified in the exercise of the (Police Department's) legitimate inquiry into the fitness and competency of its (employees). We therefore hold that the widely acknowledged policy of the Police Department whereby police officers are required upon penalty of losing their jobs, to answer all questions propounded in an "official investigation", even though the questions have no bearing upon an officer's

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702.979.3565 ♦ FAX 702.362.2060

job performance, is unconstitutional.

138.  Although the privacy right in *Shuman* concerned informational privacy, the *Whalen* case cited therein also stands for the privacy interest "in independence in making certain kinds of important decisions," such as the medical and health decisions currently being thrust upon Plaintiffs.  *See, Whalen*, 429 U.S. at 599.

139.  Further, "[i]Inquiry into potentially unconstitutional conditions cannot be avoided on the ground that the employees waived their constitutional rights by applying for employment, because that would eviscerate the Court's opinions establishing a balancing standard. ***This is equally as applicable to employees' privacy rights as to their First Amendment rights***." (emphasis added) *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 112 (3d Cir. 1987) (discussing *Whalen* right of privacy and determining that certain questions on a questionnaire applicants were to fill out for a Special Investigative Unit position implicated unconstitutional conditions).

**Unreasonable Search**

140.  "[I]t is also well established that the State may not condition employment on a public employee's consent to an unreasonable search." *Eastop v. Bennion*, 1:18-cv-00342-BLW (D. IH. Nov. 4, 2019), *citing, O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996); *Delia v. City of Rialto*, 621 F.3d 1069, 1078 n.5 (9th Cir. 2010), *rev'd on other grounds Filarsky v. Delia*, 566 U.S. 377 (2012).

141.  Being subjected to repeated invasive COVID testing constitutes an unreasonable search of Plaintiffs' bodies.

/ / /

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

**FOURTH CAUSE OF ACTION**

**BREACH OF CONTRACT**

142.    Plaintiffs incorporate the allegations in the preceding paragraphs as though fully set forth herein.

143.    The Employment Contracts (in a form substantially identical or similar to Exhibit D) between CCSD and each Plaintiff govern the relationships between Plaintiffs and Defendants.

144.    The Employment Contracts incorporate by reference the Negotiated Agreement attached hereto as Exhibit E.   For purposes of this Fourth Cause of Action, the Negotiated Agreement will be included in the term "Employment Contracts."

145.    Plaintiffs have performed all obligations and conditions required of them in under the Employment Contracts.

146.    The Employment Contracts explicitly state the contracted hours and duties for Plaintiffs.

147.    The Mandates have required Plaintiffs to work more hours without compensation in derogation of the Employment Contracts and Federal and State law.

148.    The Employment Contracts expressly state that Plaintiffs will "not be not be required to perform any duty or act which threatens the teacher's…physical safety or well-being except normal risks involved in carrying out teaching duties."

149.    The Mandates are not within the "normal risks involved in carrying out teaching duties."

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

150. The Mandates undeniably threaten Plaintiffs' physical safety and well-being.

151. Article 33 of the Negotiated Agreement, entitled "Equitable Treatment," states that "[a]ll employees have a right to work in an environment free from unlawful discrimination…".

152. However, as a result of the Mandates, Plaintiffs are being singled-out and discriminated against, while their vaccinated counterparts, who are similarly capable of transmitting COVID-19 are not subjected to the same requirements.

153. As a result of Defendants' breaches, Plaintiffs have suffered damages.

## FIFTH CAUSE OF ACTION

### DECLARATORY RELIEF – EMPLOYMENT CONTRACTS

154. Plaintiffs incorporate the allegations in the preceding paragraphs as though fully set forth herein.

155. A dispute has arisen, and actual controversy now exists between Plaintiffs and Defendants, including JOHN AND JANE DOES I - V, the unknown agencies and individuals who violated the law and harmed Plaintiffs, as to their contractual rights and obligations with respect to the Employment Contracts, Negotiated Agreement, Vaccines, and Mandates. Plaintiffs' claim that the Employment Contracts explicitly state the contracted hours and duties for Plaintiffs, that the Mandates have required Plaintiffs to work more hours without compensation in derogation of the Employment Contracts and Federal and State law, that the Mandates are not within the normal risks involved in carrying out teaching duties and undeniably threaten Plaintiffs' physical safety and well-being, all while Plaintiffs are being singled-out and discriminated against, while their vaccinated counterparts,

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

who are similarly capable of transmitting COVID-19 are not subjected to the same requirements.     Defendants disputes Plaintiffs claim. Therefore, an actual controversy exists relative to the legal and contractual duties and rights of the respective parties, which Plaintiffs requests the Court to resolve.

156.   All of the rights and obligations of the parties arose out of one series of events or happenings, all of which can be settled and determined in a judgment in this one action.  Plaintiffs allege that an actual controversy exists between the parties under the circumstances alleged.  A declaration of rights, responsibilities and obligations of the parties is essential to determine their respective obligations in connection with the Employment Contracts, Negotiated Agreement, Vaccines, and Mandates. Plaintiffs do not have a true and speedy remedy at law of any kind.

157.   As a direct and proximate result of the aforementioned acts and/or omissions, Plaintiffs have suffered damages.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

(A)     Declare the Mandates unconstitutional on their face;

(B)     Declare the Mandates unconstitutional as applied to each Plaintiff;

(C)     Enjoin Defendants from enforcing the Mandates on their face or as applied;

(D)     Award to the Plaintiffs compensatory damages, including both economic and non-economic damages;

(E)     Award to Plaintiffs their costs and attorneys' fees under 42 U.S.C. §1988m and any other applicable authority; and

(F)     Award Plaintiffs such other and additional relief as the Court deems fit.

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a right to a jury trial for all matters so triable.

DATED: December 13, 2021           **JENNINGS & FULTON, LTD.**

By: */s/ Adam R. Fulton, Esq.*
      ADAM R. FULTON, ESQ.
      Nevada Bar No. 11572
      E-mail: afulton@jfnvlaw.com
      CHRISTINA GILBERTSON, ESQ.
      Nevada Bar No. 9707
      Email: christina@jfnvlaw.com
      LOGAN G. WILLSON, ESQ.
      Nevada Bar No. 14967
      E-mail: logan@jfnvlaw.com
      2580 Sorrel Street
      Las Vegas, Nevada 89146
      Telephone: (702) 979-3565
      Facsimile:   (702) 362-2060
      *Attorneys for Plaintiffs*